UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
KIMBERLY WEBER,

                              Plaintiff,                      Civil Action No: 16-cv-6366

          -against-                                           **COMPLAINT**

                                                              Trial by Jury Demanded
NATIONAL REPROGRAPHICS INC, SCOTT
SEJKA and LORI DEHART,

                              Defendants.
-----------------------------------------------------------------------X

**PLAINTIFF KIMBERLY WEBER**, by her attorneys, Nesenoff and Miltenberg,

LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York

10001, alleges upon knowledge with respect to herself, and upon knowledge, information

and belief as to all other matters, as follows:

## STATEMENT OF THE CASE

1.      Plaintiff brings this action against Defendants National Reprographics

Inc. (hereinafter "Defendant NRI"), Scott Sejka (hereinafter "Defendant Sejka") and

Lori Defendant DeHart (hereinafter "Defendant DeHart")(Defendant NRI, Defendant

Sejka and Defendant DeHart may be hereinafter collectively referred to as the

"Defendants"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e *et seq.* ("Title VII"), the New York City Human Rights Law (the "NYCHRL")

N.Y.C. Admin. Code§ 8-101 *et se* and the New York State Human Rights Law (N.Y.

Exec. Law §§ 290 *et. seq.*)(the "NYSHRL").

2.      Plaintiff brings this action seeking declaratory relief, compensatory

damages, incidental damages, consequential damages, punitive damages, attorneys' fees

and costs and other appropriate legal and equitable relief pursuant to Title VII, the NYSHRL, and the NYCHRL.

## THE PARTIES

3.      Plaintiff Kimberly Weber ("Plaintiff" or "Ms. Weber") is a female citizen of the United States who currently resides at 1393 Colony Drive, Streetsboro, Ohio, 44241 and who was formerly employed by the Defendant National Reprographics Inc. ("Defendant NRI") as a computer engineer.

4.      Upon information and belief, at all times herein, Defendant NRI has been an entity duly organized and existing under the laws of the State of New York, with more than 100 employees, and with offices located at 44 West 18th Street, New York, New York 10011.

5.      Defendant NRI is an organization that, according to its website, "provides technology, data management and integrated digital document management solutions to businesses of all types, using state-of-the-art proprietary technology, at client sites and in our production centers."  Defendant NRI touts itself as a Woman Business Enterprise ("WBE").

6.      Upon information and belief, Defendant Sejka was NRI's Lead Developer at all relevant times. Defendant Sejka controlled the terms and conditions of Plaintiff's employment, sexually harassed Plaintiff, discriminated against her due to her gender and subjected her to a sexually hostile work environment.

7.      Decisions relating to assignments and administrative issues were made in and by the New York office, and Plaintiff and Defendant Sejka regularly communicated with and took orders from the New York office.

8.     Upon information and belief, Defendant Dehart is the Human Resources Manager at Defendant NRI who controlled the terms and conditions of Plaintiff's employment and who sexually harassed Plaintiff and discriminated against her due to her gender.

9.     At all relevant times, the Defendants were each Plaintiff's "employer" as that word is defined by Title VII, the NYSHRL, and the NYCHRL.

10.    At all relevant times, Plaintiff was an "employee" of Defendants as that word is defined under Title VII, the NYSHRL, and the NYCHRL.

11.    At all relevant times, Plaintiff was willing and able to perform her employment duties and obligations and was qualified for the employment position she held at Defendant NRI.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so closely related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant NRI maintains its principal place of business within the Southern District of New York.

## CONDITIONS PRECEDENT

15.    Plaintiff timely filed a charge of gender discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about May 6, 2015.

16.    On May 19, 2016, Plaintiff received a Notice of Right to Sue from the EEOC.

## FACTUAL BACKGROUND

17.    Plaintiff was employed at Defendant NRI at all relevant times.  She was hired to serve as a junior developer.  Ms. Weber was required to report to Defendant Sejka, Defendant NRI's lead developer.  Defendant Sejka was charged with training, mentoring, helping, overseeing and managing Plaintiff.

### Defendant Sejka Shows Unusual Interest in Plaintiff's Personal Life

18.    Plaintiff and Defendant Sejka spent ample time working together and were often alone.  Defendant Sejka was unusually interested in Plaintiff's personal life and regularly inquired about her husband, nieces and nephews, extended relatives and friends.

19.    He also often asked to look through her cell phones "camera roll,' where she kept many pictures of her family events and activities. Although Plaintiff found his requests and interest in her personal life odd, she did not have any especially personal pictures on her camera roll and was reluctant to create friction with her boss by telling him that he could not look at her pictures.

### Defendant Sejka Violates Plaintiff's Privacy By Searching Her Phone

20.    In or about early October, Defendant Sejka asked if he could see pictures from Plaintiff's recent family trip to Whitehouse Fruit Farms, a country store and farm, where Plaintiff and her family had recently gone for a hayride, and to attend the petting

zoo, spend time with horses, visit a pumpkin patch and enjoy the various food offered at the farm.

21.    Plaintiff, thinking Defendant Sejka may be interested in taking his own family there, handed him her phone so that he could scroll through the family pictures as he had asked to do. Plaintiff only authorized Defendant Sejka to view the pictures taken at Whitehouse Fruit Farms.

22.    Plaintiff was horrified to learn, however, that Defendant Sejka had no interest in her wholesome family fun or in learning about Whitehouse Fruit Farms. Instead, Defendant Sejka, pretended to look at Plaintiff's camera roll, and instead, without permission and with secrecy, went into Plaintiff's personal text messages and searched for messages with sexual content and/or pictures.

23.    Defendant Sejka located a series of private, sexual messages between Plaintiff and her husband, including a number of private, sexual images that Plaintiff had sent to her husband.

24.    Plaintiff was busy doing work when she realized that Defendant Sejka had been looking at her phone for an inordinately long time. She looked up from her computer and noticed that he was extremely engrossed in examining her phone and she immediately became uneasy and uncomfortable.

25.    When she suspiciously asked him what he was looking at and tried to take her phone back, Defendant Sejka quickly closed out what he was viewing, and turned bright red. Defendant Sejka refused to answer and tell Ms. Weber what he had been looking at. When Plaintiff again asked Defendant Sejka what he had been looking at, Defendant Sejka replied, "If I told you, you would turn three shades of red."

26.     Plaintiff became extremely uneasy, embarrassed and upset. She repeatedly asked him to tell her what he had been looking at but he refused. Instead of answering her, he asked, "Do you have something you want to tell me?" and told her that he could give her a "key word" as a hint to what he had been looking at.

27. For approximately thirty minutes, Defendant Sejka tortured Plaintiff by acknowledging that he had been look at something he should not have been looking at while refusing to reveal to her what he had seen.

28.     Defendant Sejka repeatedly made vague, degrading and menacing comments to Plaintiff about what he had seen. Plaintiff's shock, confusion and sense of being violated grew. Finally, Defendant Sejka admitted to Plaintiff that he used the "spotlight search" feature on her iPhone to search her private text messages using a key word that he refused to reveal.

**Defendant Sejka Engages in Intense Sexual Harassment of Plaintiff**

29.     It was clear to Plaintiff that Defendant Sejka had searched her private text messages and seen images of her in private, sexual moments. Plaintiff told Defendant Sejka that he was never allowed to see her phone again.

30.     Plaintiff made it abundantly clear that she was horrified and did not want to hear another word about her phone and the sexual images of her that Defendant Sejka had sought out and found, but Defendant Sejka continued to obsess over the topic.

31.     Thereafter, he repeatedly called her "dirty girl" and appeared obsessed with the images that he had found on her iPhone.

32.     Approximately two hours later he began harassing her for her phone password so that he could see the images again. Plaintiff was appalled and obviously

6

upset by his request.  She responded by saying "absolutely not," but Defendant Sejka continued to pester her about seeing the sexual images for the rest of the day.

33.     Plaintiff was absolutely relieved when the day ended and she could escape Defendant Sejka's leering and sexually suggestive comments.

34.     Plaintiff was horrified by the day's events, and that evening she discussed what had happened with her family and friends.

35.     Although she was very upset about the idea of returning to work with Defendant Sejka, because she needed her job she decided to return the following day.

36.     Plaintiff also decided that she would not report Defendant Sejka's blatant violation of her privacy and sexual harassment for several reasons: first, because the information that he found and the disgusting things that he said to her afterwards were embarrassing and she did not want to talk about them with her employer; second, because she had liked Defendant Sejka as a friend and did not want to see him get in trouble or retaliate against her if he did not get in trouble; and, third, she was concerned that even if she did go to Human Resources (hereinafter "HR"), she would be punished instead of Defendant Sejka because he was Defendant NRI's lead developer and extremely integral to the company.

37.     Plaintiff decided to give Defendant Sejka one more chance and decided that she would let it go, and that if he brought it up she would again tell him to stop.

**Defendant Sejka Apologizes and Promises to Stop Subjecting Ms. Weber to a Hostile Environment**

38.     Plaintiff was relieved when she returned to the office on October 6, 2014 and Defendant Sejka immediately apologized to her and told her that he would not bring up the images that he had found on her phone again.

39.     Plaintiff told him that she was relieved and happy to hear that and she proceeded to pretend as if it had not happened.  Defendant Sejka acted in a professional manner for the rest of the day, and Plaintiff was relieved.

**Defendant Sejka Sexually Harasses Plaintiff… Again**

40.     Unable to keep his promise, and once again, alarmingly sexually fixated, on or about October 7, 2014, Defendant Sejka spent the work day aggressively begging Plaintiff to show him the sexual images of her on her phone and to put her password in so he could see her pictures.  Plaintiff, horrified and humiliated, repeatedly refused, but Defendant Sejka would not stop harassing her to allow him to see her pictures.

41.     Defendant Sejka's harassment continued on October 8, 2014 as well.

42.     On or about October 9, 2014, Defendant Sejka showed Plaintiff a series of risqué Halloween costumes on the internet and told her that she needed to get a skin tight one-piece costume.  He told her she would look good in one of the tight costumes and again referred to her as a "bad girl" and a "dirty girl."

43.     He also began to pout and complain about not being "allowed" to see Plaintiff's phone and asked repeatedly when he would be able to see her "pornographic pics and texts."

44.     Defendant Sejka began overtly staring at Plaintiff's body in a suggestive manner that was meant to humiliate and intimidate her.  He repeatedly made inappropriate comments about her pants, and asked what sort of jeans she was wearing. Plaintiff felt so uncomfortable, that she tried to avoid walking around the office in front of him each time that she had to get up from her desk to walk anywhere in the office.

45.     Defendant Sejka became increasingly frustrated that Plaintiff would not allow him to access her pictures.  Plaintiff told him in no uncertain terms that she had never agreed to let him access her personal private images and messages with her husband, and that she would never allow him to do so in the future.

**Defendant Sejka Remotely Accesses Plaintiff's Computer**

46.     On or about the early morning of October 15, 2014, Plaintiff was sleeping when she was awoken by the sound of her computer.  She initially ignored it, but because she had never heard similar sounds from her computer before she eventually got up to investigate.

47.     When she opened her computer she was shocked to see that someone had accessed the computer and was scrolling through her photographs.   She immediately thought of Defendant Sejka's obsession with her photographs and realized that it must be him, as he had the motive and the means to break into her computer and access her camera roll.

48.      Plaintiff was shocked and horrified.  The person accessing her computer, believed to be Defendant Sejka, immediately began to log out of her computer.  Alarmed that the person accessing her computer, believed to be Defendant Sejka, could see her through the computer's camera, she immediately dropped the computer.

49.     Plaintiff returned to bed but was panicked and could not sleep.  She laid in bed all night dreading the thought of having to return to work with Defendant Sejka.

50.     Desperate to keep her job, Plaintiff decided that she had no choice but to try to get through the day with Defendant Sejka.

51.     The following day, Plaintiff had to appear at work with Defendant Sejka. He acted strangely distant and formal, and his behavior made Plaintiff feel even more uncomfortable and on edge. Upon information and belief, Defendant Sejka was acting so strangely because he knew that Plaintiff had caught him accessing her computer to get to her personal photographs.

52.     Plaintiff felt incredibly awkward and, soon realized that Defendant Sejka could terminate her if he felt like it. After a little while, Plaintiff tried to lighten the mood by joking around with Defendant Sejka in the innocent manner which she always had. When she sent him some humorous text messages however, he immediately took the conversation back to a sexual place, warning her that she should make sure that she sends the "right texts" to the "right guy."

53.     Inappropriately and erroneously spurred on by Plaintiff's attempts at cordiality, Defendant Sejka soon began begging her to let him see the pictures on her phone again. When Plaintiff refused, Defendant Sejka became angry. His attitude seemed to turn again a few minutes later, however, and he again began harassing Plaintiff to let him see her phone.

54.     Plaintiff refused and Defendant Sejka asked, "Are there still bad things on there?" Plaintiff responded that she did not know.

55.     Though Plaintiff is a soft-spoken, passive person, she had had enough, and she adamantly told Defendant Sejka that he was not allowed to see her phone in any case.

56.     As soon as Plaintiff told him that he would never see her phone, Defendant Sejka's mood visibly soured and he strangely announced he was "calling it an

early day" before leaving at 3:30 instead of 5:00.  It was clear that he was outraged and angry at Plaintiff for refusing to let him see her phone.

57.     When Defendant Sejka left, it was clear to Plaintiff that Defendant Sejka was no longer willing to work with her unless she allowed him to view her private personal photographs and engage in sexual banter with him.  As anxious as she was to do so,, Plaintiff decided that she must tell HR what Defendant Sejka was doing to her.

58.     The following day Defendant Sejka was not scheduled to work in the office and Plaintiff worked from home, but she dreaded the idea of working with Defendant Sejka again.  She spent the weekend working up the courage to report him for the sexual harassment and retaliation she had endured since Defendant Sejka violated her privacy by accessing her personal images on her phone and computer.

**Defendant Brutally Dismisses Plaintiff's Complaints**

59.     On or about October 20, 2014, Plaintiff finally worked up her courage and contacted Defendant NRI's HR Department in New York City to report Defendant Sejka's illegal behavior.

60.     Plaintiff was shocked by the cold and callous way her complaint was received.  It was clear that Defendant NRI's HR Department did not believe what she said.  Defendant NRI's HR team also made it clear to her that if Defendant Sejka did look at anything on her phone, it was her fault, and not his, because she had not protected her phone from Defendant Sejka.

61.     Plaintiff was told to work from home while they investigated and further advised that they would tell Defendant Sejka to communicate with her by email only.  HR told her that they would come from New York to her office in Ohio for an in-person

meeting with her only when they could get around to it. HR's reaction was so negative that it was clear to Plaintiff that Defendant NRI did not care that she was being sexually harassed, and that she would be phased out.

**Plaintiff Suffers Severe Panic Attacks**

62.     After being rebuffed by Defendant NRI's HR Department, Plaintiff began to suffer from anxiety and panic attacks. When she informed HR that she was overwhelmed by anxiety and needed to take a few days off until she was able to meet with HR, she was told to use her vacation days.

63.     On October 22, 2014, Defendant's HR Manager, Lori DeHart ("Defendant DeHart") wrote:

> "As discussed last night, we are fine with you taking some vacation time. Please let me know if you will be working on Friday or Monday. We are sorry that you are not feeling 100% right now. We have separated the two of you from interaction other than e-mail. Your work direction will come from More or an e-mail. We will not require you to go to the office, which we rented, to work at this time. You can work from your house as you have in the past. The only day you will need to report is when I am there next Wednesday so we can sit down and discuss everything face to face. I tried to get there sooner but it is not possible due to work schedules. I will let you know what time we will meet. Thanks."

64.     Upon information and belief, Defendant DeHart thought it necessary to mention the fact that Defendant NRI had rented the space when agreeing that Plaintiff could work from home in order to make her feel stupid for not wanting to work with Defendant Sejka and to remind her that her complaint was wasting Defendant NRI's resources and money.

65.     Thereafter, Plaintiff took a few days off but commenced working again the following Monday. Though she was clearly logged in and obviously working, HR

peppered her with communications and insinuations that they did not believe she was actually working. Plaintiff had never been treated that way from anyone at Defendant NRI when she chose to work from home in the past.

### Defendant Dismisses Plaintiff's Concerns, Vindicates Defendant Sejka, and Blames Plaintiff For Causing the Sexual Harassment

66.     Plaintiff soon met with Defendant DeHart in person.  Defendant DeHart was skeptical and dismissive of Plaintiff's concerns and indicated that she considered Plaintiff to be a "troublemaker."   Upon information and belief, Defendant DeHart purposefully subjected Plaintiff to a hostile working environment by belittling and offending Plaintiff.

67.     Defendant Dehart was also suspiciously protective of Defendant Sjeka and told Plaintiff it sounded like a he said/she said situation, which they could do nothing about.   She repeatedly expressed disbelief that Defendant Sejka could have accessed Plaintiff's computer remotely, though he certainly had the resources and ability to do so. Plaintiff felt extremely attacked and belittled during the meeting.

68.     Defendant DeHart reluctantly advised Plaintiff that Defendants would conduct an "investigation" to see if there had been any wrongdoing.

69.     On or about October 29, 2014, Plaintiff was again called into a meeting with Defendant DeHart, who triumphantly reported to Plaintiff that Defendant NRI had conducted an investigation that "proved" Defendant Sejka had not remotely accessed her computer.    Plaintiff responded that she would be relieved if that were the case. Defendant DeHart did not explain how Defendant NRI could be so positive that Defendant Sejka had not accessed her computer but presented the investigation findings as irrefutable.

70.     Though Defendant DeHart acted as if the alleged "finding" that Defendant Sejka resolved Plaintiff's issue and proved that Plaintiff was a liar, Plaintiff reminded her that Defendant Sejka had violated her privacy by searching her phone and remained obsessed with seeing her private pictures and discussing them.

71.     Shockingly, Defendant DeHart told Plaintiff that the phone situation was *her (Plaintiff's) fault* because she gave Defendant Sejka access to her phone and did not specifically say "You are only allowed to look at my camera roll."  Defendant DeHart explained that unless she said, "You are only allowed to look at my camera roll" then it was Ms. Weber's fault if he looked at something else.   Plaintiff explained that she had told Defendant Sejka that she was giving him her phone so that she could look at her camera roll.

72.     Defendant DeHart insisted that such language was not enough and that the issues with Defendant Sejka seeing images on her phone, "*if that had even happened,*" was Plaintiff's fault.  She further advised that, in any case, Defendant Sejka had denied any wrong doing, so it was a matter of he said/she said and there was nothing that Defendants could do about Plaintiff's allegations.

73.     Defendant DeHart refused to discuss the ongoing harassment related to the pictures and continued to purposefully ridicule and belittle Plaintiff.

**Defendant Belittles Plaintiff When She Expresses Anxiety About the Proposed "Solution"**

74.     Defendant DeHart begrudgingly explained that they were "willing" to let Plaintiff work from home, since she was uncomfortable being around Defendant Sejka, but disdainfully and insultingly warned Plaintiff that she would actually have to work if

she was going to work from home and bizarrely accused her of not working on Monday and Tuesday of that week.

75.    Defendant DeHart further explained that Plaintiff and Defendant Sejka would communicate through monitored interaction on email and spark IM chat.

76.    Plaintiff expressed concerns about communicating with Defendant Sejka on a daily basis, especially after he had treated her so badly BEFORE she had reported him and was nervous about how he would treat her after she reported him.  She told Defendant DeHart that the idea of just jumping back into daily communications with Defendant Sejka made her uncomfortable as did the idea of working from home, since HR had harassed her the first day she worked from home after reporting the event and she had already accused her of "not working" when she was working from home that very week.

77.    Apparently outraged by Plaintiff's concerns, Defendant DeHart began to mock and belittle Plaintiff in a highly unprofessional and mean-spirited, nasty manner, sarcastically referred to Ms. Weber in the third person and patronizingly said:, "I don't know what Kim can handle, she will have to decide that" and "I am not sure of the resolution that Kim hopes to see."  Plaintiff was shocked to be treated in such a blatantly degrading and condescending matter.

**Defendant Calls Plaintiff a Liar**

78.    Defendant DeHart then advised Plaintiff that because HR's investigation revealed that Ms. Weber "had lied about [Defendant Sejka] accessing her computer" how could any of [her] other allegations be believed?"  Defendant DeHart actually asked

Plaintiff how anyone could decide the other accusations were truthful since she had lied about Defendant Sejka accessing her computer.

79.     Plaintiff reminded Defendant DeHart that in fact there was obviously no way that she could have definitively known who had accessed her computer, and that she had reported that she believed that it was Defendant Sejka because of his bizarre and inappropriate obsession with seeing her personal photographs at the exact same period of time.  Defendant DeHart refused to accept Plaintiff's clarification and told her that was not what she originally told Defendant DeHart and that Defendant DeHart had notes to "prove" what she said.

80.     Plaintiff could not believe that she was being called a liar and blamed for causing Defendant Sejka to sexually harass her. It was clear to Plaintiff that Defendants did not intend to protect her or keep her employed.

81.     Defendant DeHart proposed that Plaintiff work from home and communicate with Respondent Sejka by monitored email and IM chat. Defendant DeHart insisted that the proposed "resolution" was the best "solution" Defendants could offer Plaintiff.

82.     Plaintiff felt sure that her job would be marginalized if she was not allowed to come to the office and that she would not be able to develop her skill set. Plaintiff asked for time to consider the proposed "resolution" because she did not feel comfortable communicating with Defendant Sejka. Defendant DeHart told her she could have until Friday to decide whether she accepted the proposed resolution. It was agreed that Plaintiff would not work until she made a decision about the proposed "solution", because working would require her to communicate with Defendant Sejka.

83.   On Friday, Defendant DeHart demanded an answer from Plaintiff.  She also bizarrely insinuated that Plaintiff was supposed to let her know whether or not she was working.

84.   Plaintiff advised her that, as agreed, she had not been working.  She also advised Defendant DeHart that she did not accept the proposed resolution.

85.   Defendant DeHart responded that she had until Monday, November 3, 2014 at 9 a.m. to think about whether she had a proposed alternative solution to consider or whether she was resigning.

86.   On Monday, November 3, 2014, before calling to discuss Plaintiff's proposed alternative solution, Defendants terminated Plaintiff by sending her a letter telling her that she had voluntarily resigned. The letter untruthfully and self-servingly stated that Plaintiff had been warned that "a lack of response to our phone calls and e-mails, would cause [Defendant NRI] to accept [Plaintiff's] voluntary resignation."

87.   Plaintiff was subjected to a hostile work environment and then belittled and ultimately fired in retaliation for reporting the sexual harassment she endured.

## CLAIMS FOR RELIEF

### AS AND FOR THE FIRST CAUSE OF ACTION
*(Gender Discrimination in Violation of Title VII, the NYCHRL, and the NYSHRL)*

88. Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

89. Plaintiff is a female and is therefore a member of a protected class under Title VII, the NYCHRL and the NYSHRL.

90. Plaintiff was qualified to work as an employee for Defendant NRI and she satisfactorily performed the duties required by the position she held at Defendant NRI.

91. As set forth in detail above and herein, Defendants subjected Plaintiff to discrimination and disparate treatment on the basis of her gender and a hostile work environment on the basis of her gender.

92. As set forth above and herein, Defendants subjected Plaintiff to sexual harassment consisting of, among other things, inappropriate remarks to Plaintiff of a sexual or otherwise romantic nature, and unwanted advances of a sexual or otherwise romantic nature.

93. The discrimination Plaintiff suffered while employed at Defendant NRI was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

94. The discrimination that Plaintiff suffered while employed by Defendant NRI severely affected the terms and conditions of her employment.

95. By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

96. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

97. Accordingly, Plaintiff was discriminated against on the basis of her gender by virtue of having been treated less well than her similarly situated colleagues outside her

protected class, having been subjected to a hostile work environment, and having been subjected to sexual harassment by the Defendants based on her gender, in violation of Title VII, the NYCHRL and the NYSHRL.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in Violation of Title VII, the NYCHRL, and the NYSHRL)*

98.     Plaintiff repeats and re-alleges each and every allegation as set forth above, herein.

99.     Plaintiff repeatedly complained to Defendants and/or Defendants' management regularly witnessed the severe and pervasive gender discrimination, sexual harassment, and hostile work environment she was subjected to during her employment with Defendant NRI.

100.     Plaintiff's protests and complaints to Defendants about the severe and pervasive gender discrimination, sexual harassment, and hostile work environment she was subjected to during her employment with Defendants was a protected activity under all relevant law.

101.     Plaintiff's complaints were repeatedly ignored and discouraged by Defendants' managerial and Human Resource employees in violation of the law, as well as, upon information and belief, Defendants' own internal policies.

102.     Plaintiff notified and complained to Defendants' Management of the severe gender discrimination, sexual harassment, and hostile work environment she was subjected to and protested the fact that Defendants' Management and HR representatives failed to act responsively.

103.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of gender discrimination, sexual harassment, and a hostile work environment.

104.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment.

105.    Because she protested Defendants' unlawful behavior, Plaintiff was terminated.

106.    The retaliation Plaintiff endured at Defendants' hands substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment in violation of the Federal Law as well as New York State and City Human Rights Laws.

107.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory termination.

108.    As a direct and proximate result of said unlawful employment practices and  disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due her.

109.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

110.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her

future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

111.    Accordingly, Plaintiff was retaliated against in violation of Title VII, the NYCHRL and the NYSHRL..

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Gender Discrimination and Retaliation – Ohio Revised Code Chapter 4112)*

112.    Plaintiff repeats and re-alleges each and every allegation as set forth above, herein.

113.    Defendants intentionally discriminated against Plaintiff on the basis of her gender by, allowing her to be sexually harassed, failing to stop the sexual harassment and ultimately terminating her employment in violation of the Ohio Revised Code, Chapter 4112 in response to her complaints of sexual harassment.

114.    Defendant's discriminatory conduct was willfull, intentional, wanton, malicious, and in conscious disregard of Plaintiff's rights.

115.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has been injured and is entitled to judgment and compensation pursuant to the Ohio Revised Code § 4112.99.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)      On the First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(iii)     On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(vi)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Further,** Plaintiff demands a trial by jury.

Dated: New York, New York
         August 10, 2016

NESENOFF & MILTENBERG, LLP.
*Attorneys for Plaintiff*

By: _____
Megan S. Goddard, Esq.
Gabrielle M. Vinci, Esq.
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500

TO:

**National Reprographics, Inc.**
**44 West 18th Street**
**New York, New York 10011**

**Scott Sejka**
**44 West 18th Street**
**New York, New York 10011**

**Lori Dehart**
**44 West 18th Street**
**New York, New York 10011**